**OPM – USA – INC., a Florida corporation, Plaintiff,**

v.

**BOARD OF COUNTY COMMISSIONERS OF BREVARD COUNTY, FLORIDA, a Florida local government, Defendant.**

No. 97–408–CIV–ORL–19.

United States District Court,
M.D. Florida,
Orlando Division.

Aug. 26, 1997.

Mary D. Hansen, Storch, Hansen & Morris, P.A., Daytona Beach, FL, for OPM – USA – INC.

Scott L. Knox, County Attorney, Viera, FL, for Board of County Commissioners, Brevard County, Florida.

## ORDER

FAWSETT, District Judge.

This case arises under the Federal Telecommunications Act of 1996, 47 United States Code Section 332(c)(7), *et seq.* Section 704 of such act requires that a decision by a local government to deny a request to place or construct a personal wireless facility must be in writing and supported by substantial evidence contained in a written record. This Court has jurisdiction. 28 U.S.C. § 1331.

## FINDINGS OF FACT

Plaintiff OPM – USA – INC., a Florida corporation (R–55), applied for a conditional use permit to construct a 400 foot telecommunications tower on approximately twenty acres of land in Brevard County zoned AU (Agricultural Residential) owned by Robert E. Smith, Walter A. and Mary R. Cerrato and Walter A. Cerrato, Jr. (R–1–17). The site of the proposed tower was to be in an abandoned watermelon farm in an area of the county denoted as rural and some residential (R–25, 33). Approximately one-half mile southwest of the proposed site is an existing Florida Department of Transportation Tower (R–23), and 2,400 feet east of the proposed cite is another tower (R–24).

On this site OPM – USA, INC. plans to build a multi-user telecommunications system capable of supporting 60 antennas and associated transmission lines (R–31).[1] The appli-

---

1. OPM – USA, INC. represented that this co-location facility would reduce the need for a large number of such facilities in Brevard County (R–31), would enhance public safety by providing greater access to emergency services, and would promote instantaneous communications between members of the public (R–33). At the hearing on February 20, 1997 before the Brevard County Commission, a representative of the State of Florida further elaborated on co-location in this tower, stating that seven different law enforcement agencies were combining to be placed at the top of the tower for needed coverage for law enforcement at a cost of over $100,000.00, which would eliminate proliferation of towers (R–124–125).

cant presented information showing that the tower would be built to fulfill applicable standards, including but not limited to Federal Aviation Administration requirements,[2] and would be resistant to the elements such as wind. (R–36–37, 40–41). The aesthetics, effect on property values, environmental considerations and public safety aspects of the proposed tower were also described (R–37–38, 44). OPM – USA, INC. placed in the record photographs of existing tower facilities which it currently operates (R–45–47), detailed drawings of is tower construction (R–50–54), information concerning its insurance coverage (R–56–57), and extensive information concerning the personal communications services industry (R–58–75).

The Defendant County's staff report on OPM – USA, INC.'s application to construct the telecommunications tower in an AU zoning classification represented that the structure was consistent with future land use designation and maximum allowable residential density requirements and would maintain acceptable levels of service (R–84). The report noted that while the request was consistent with the requirements for towers and antennas, the visual impact of the structure and its lighting should be considered (R–85). Staff also reported that eighty to one hundred percent of the property was functional wetlands and stated:

> Maps indicate the proposed site is within a wetland. Towers are a commercial use not permitted in a wetland by the Comprehensive Plan and County Code. Natural resources will consider DEP or SJRWMD determination of wetland status.

(R–85).[3]

Later in the report under "Environmental Factors," staff reported that the development proposal was consistent with the development parameters of the wetlands and commented:

> Willing to consider DEP jurisdiction and/or SJRWMD. Our maps indicate the tower is proposed within wetlands. This commercial use in wetland is currently not

approvable under comprehensive plan and/or ordinance. (R–87).

At its meeting on January 6, 1997, the ten member Brevard County Planning and Zoning Board unanimously approved the request for a conditional use permit for tower and antennae (400 square foot telecommunications tower) in an AU zoning classification (R–88–89, 90) with a conservation easement. This occurred after staff was asked to explain comments on the staff report. The minutes reflect:

> Rich Enos stated that "the conservation element of the Comprehensive Plan describes certain uses that are not permitted in wetlands, such as commercial and industrial uses." He said that this request is for AU zoning, so the zoning is not commercial, but the Natural Resources Office which is the office that implements that policy has described towers as commercial. Mr. Enos further stated that this applicant may need to make a request to appeal that determination, and also there may have been some recent changes in those wetland policies. He said typically that type of issue is handled at the site plan stage, not at the zoning stage, and he does not see any representatives from the Natural Resources Office here today to address that issue. Mr. Enos stated that if that does become an appeal to the Comprehensive Plan, this zoning body is not the appropriate body to consider that. He said that appeal would be heard by the Local Planning Agency, and this Board only needs to deal with the zoning issue at this point. (R–90).

When questioned by a Planning and Zoning Board member whether there were wetlands on the site, the minutes report:

> Mr. Enos stated that there may be wetlands, but typically we don't deal with wetlands issues at the zoning stage unless we are 100% sure there are wetlands. He advised that the Natural Resources staff believes that there are some wetlands on

---

2. (R–160).

3. DEP is assumed to mean Department of Environmental Protection, and SJRWMD is assumed to mean St. Johns River Water Management District.

this site up to 80–100%; however, that does not mean that this project could not be designed around the wetlands or designed in such a manner that the wetland impact is mitigated. Mr. Enos added that that is why these issues are not decided at the zoning level. He further stated that the only reason that this is brought up at the zoning hearing is to make sure that the applicant is aware that even if they get the zoning, they may run into a problem when they get to the site plan stage. Mr. Enos added that the applicant is aware of that.

\* \* \* \* \* \*

Mr. Enos stated that the Comprehensive Plan does permit very limited residential density of wetlands, and he thinks that the issue here is, do you want houses at one unit per ten acres, or a communications tower. He said that is something the Board may want to consider.

*Id.*

OPM – USA, INC. represented to the Planning & Zoning Board that while it did not have a surveyed site at that point and therefore neither Plaintiff nor staff knew where the wetlands were, OPM – USA, INC. was willing to put a conservation easement on all portions of the site not directly related to tower operation which would amount to approximately seventeen of the twenty acres. *Id.* As noted earlier, this offer of a conservation easement was accepted as part of the Planning and Zoning Board's unanimous approval of Plaintiff's application.

At the public hearing on Plaintiff's application held January 27, 1997, Plaintiff represented that the tower height had been reduced to 330 feet[4] so there would be no wetland impact (R–92) and that OPM – USA,

INC. would put in conservation easements (R–93). OPM – USA, INC. stated that it would do what it could to reduce the impact of the tower which would not be seen behind the trees in the heavily wooded area,[5] and further that it had an MAI appraiser do a complete review of property values with the resultant finding that if there was a 100 foot buffer, there would be no effect on property values (R–93).[6] Consideration of Plaintiff's Application was tabled at Commissioner Scarborough's request so that he could look at the existing tower located one half of a mile from the proposed site (R–93).

The Brevard Board of County Commissioners reconvened on February 20, 1997 and again considered OPM – USA, INC.'s application. The report of Ron Krause, a certified property appraiser, was distributed (R–101). A certified set of structural drawings by the engineer of record was distributed showing that in a catastrophic event the tower would fall solely on the twenty acres of property supporting it (R–102). The Board was advised that OPM – USA, INC. would put a conservation easement on the site which would preclude development of the remainder of the twenty acre site (R–102–103), and that the tower would be placed on the abandoned watermelon farm portion of the site which was not considered wetlands (R–103).[7]

Mr. Krause addressed the Board, indicating he was with Pomeroy Appraisal and specialized in evaluation of damages related to properties subject to condemnation (R 103–104). He reported that he and an associate had done research of studies around the country on the impact of communications

---

4. At the hearing before this Court the parties referred to the height of the proposed tower as 340 feet.

5. Presumably this refers to seeing the tower at its base. The record reflects that due to lack of activity for at least five years the access road to the abandoned watermelon farm, Black Gum Road, is only passable for approximately fifty yards from the end of the pavement due to dense vegetation (R–18–22). Further the record reflects that upon completion of towers designed and constructed like the one proposed by Plaintiff, they became "transparent" to residents (R–37).

6. The record reflects that the instant tower would be setback 200 feet from the property line and that the nearest house would be 600 feet from the tower (R–110).

7. OPM – USA, INC. advised the Board that it had present at the hearing to answer any questions of the Commissioners, Joe Young, from Biological Consulting Services, a wetlands expert who formerly worked for the Department of Environmental Regulation (now known as the Department of Environmental Protection) (R–103). The record does not reflect that any question was asked of Mr. Young during this meeting or that he was specifically afforded the opportunity to speak.

towers on surrounding properties. Mr. Krause reported:

> Of the people we contacted, one study— we found one study. Of the other people we contacted, they are all of the opinion that, in general, that communications towers didn't have an impact in the general area and any impact—potential impact would be on a specific nature, meaning that on the abutting property, possibly. And the opinion was that in the area where it was commercial property or a rural occasion that there was little, if any, impact on those type properties.
>
> There was some concern if the tower is located directly in a subdivision and it wasn't buffered, correctly buffered or a distance of buffering, there has some potential for damages. The one study we did have indicated that same result.

(R–104).

Mr. Krause was asked:

> Was it the conclusion of your study and the opinion of you and Mr. Allen that this tower in this location would have no adverse effect on property values to the residential properties?

(R–104–105).

Mr. Krause answered: "That's correct. Thank you." (R–105).

A discussion ensued precipitated by questions from Commissioner Higgs who stated that she had attended the day before a meeting of the Regional Planning Council at which representatives of Orange County, Florida presented issues of performance bonding and camouflaging (R–107, 119) and percentage of height of tower to setback, five times the height of the tower being required for setback from abutting residential property[8] (R–109).

In response to a question concerning failure to construct the tower or abandonment, OPM – USA, INC. agreed to accept a condition that the conditional use would lapse if construction did not commence within, or the tower was not used for, six months (R–119–122).[9]

After hearing from a representative of the Florida Department of Law Enforcement[10] as to the use seven agencies of the state hope to make of the tower, the County Commission opened the floor for public comment. In opposition to the tower three people spoke. One person stated that the tower was in a wetlands area, one person feared it would open the door to more towers being built there, all three persons said it would depreciate property values, one person objected to construction trucks coming in for six months or more, and one person felt the tower "is totally foreign to the natural aesthetics of the community," is unsightly, creates an inconsistent commercial use of property in the residential neighborhood, and is a threat to the safety and welfare of the neighborhood (R–126–133). Six letters opposing the construction of the tower for these and the additional reason that it would cause static with telephone and television transmissions were also placed in the record (R–171–177).

In response to these articulated concerns, a representative of Plaintiff stated, *inter alia,* that the tower would not be located in a wetland[11] and that all the wetlands on the site would be protected by a conservation easement which would preclude development on the tract (R–134–136), that co-location of services on towers such as the one proposed meant fewer towers, and that the tower would meet Federal Communications Commission requirements for radio frequency emissions which Plaintiff would agree to have imposed as a special condition (R–136–137).

OPM – USA, INC. then noted the crux of the issue was compatibility, stating:

---

**8.** Counsel for OPM – USA, INC. explained that if the tower were setback more, it would be placed in wetland areas of the property. (R–108, 109–110).

**9.** OPM – USA, INC. pointed out that it had four users for the tower, including the Florida Department of Law Enforcement, and that this was to be a co-location tower. (R–119–120). Plaintiff presently has 27 carriers using the eight towers it has constructed. *Id.* at R–120.

**10.** R–124–125, 135.

**11.** OPM – USA, INC. again offered the opportunity for testimony from Joe Young who was present and was represented to be an expert in this field, an offer which appears not to have been accepted.

Towers ain't pretty. They tend to be large. They have to be, because they have to be tall.

(R–137). Plaintiff summarized what it had done to avoid the negative visual impact: (1) It would be a pylon, not lattice type tower, which would be less imposing (R–137) (2) the buffers were sufficient; and (3) the fall radius would be solely on the property. *Id.* Plaintiff distinguished the tower from a commercial use, stating commercial uses are incompatible with residential uses due to their intensity because commercial uses: (1) use a lot of pavement causing the need for storm facilities to deal with run off problems, (2) generate a lot of traffic and (3) have the potential to pollute (R–137–38). OPM – USA, INC. represented that these commercial use factors do not apply to a telecommunications tower: it is nonpolluting to air and water, it requires maintenance about once every 23 days by a person in a maintenance pickup truck, it is well secured with sensors so police services are not necessary, it does not need water and sewer, and it causes a tax increase without the need for any services because it is an improvement (R–138–139). Further the OPM – USA, INC. representative again pointed out that because it is a 340 foot tower with a capacity of sixty antennas, there would not be a need for proliferation of antennas. (R–139–141).

Following these presentations, the public presentation portion of the hearing was closed. Commissioner Scarborough explored the idea of moving the tower further to the east on the twenty acre tract so it would be farther from the homes (R–142). Commissioner Higgs then stated that at the Regional Planning Council meeting, Orange County said it was looking at requiring 3,500 feet between monopole towers over 170 feet and 500 percent of the height of the tower (or 1,700 feet for the instant tower) as a required buffer from abutting residential areas. Ms. Higgs noted that the instant tower did not meet these criteria (R–143–144).

Commissioner Scarborough moved to deny the application, which motion was seconded by Commissioner Cook (R–145). On advice

of counsel the matter was unanimously tabled until staff could develop a proposed order consistent with the Federal Telecommunications Act (R–146, 148–149) with the hearing to approve the proposed order rescheduled for March 20, 1997 [12] (R– 149–151).

With a memorandum dated March 21, 1997, Resolution 97–54, dated March 20, 1997 denying the conditional use permit application, was placed in the record (R–167–168). The resolution stated, *inter alia:*

### FINDINGS OF FACT

The Board of County Commissioners makes the following findings of fact based upon the record and evidence presented in this cause:

1. The applicants seek an Conditional Use Permit for a 400 ft. telecommunications tower;

2. The property for which the applicant seeks approval is a 20–acre site located in Section 18 Township 21, Range 35 East in Brevard County, Florida, approximately 350 feet east of the eastern terminus of Black Gum Drive;

3. The property for which the applicant seeks a Conditional Use Permit is zoned Agricultural–Residential;

4. A residential area of existing single-family homes is located approximately 600 feet west of the proposed CUP site;

5. The large portion of the 20–acre proposed site is comprised of wetlands. However, the applicant proposes to locate the tower in an uplands portion of the site;

6. The applicant presented an expert witness, Ron Krause, from Pomeroy Appraisals, a full-time real estate broker, and professional real estate appraiser. Based upon Mr. Krause's testimony, the Board finds that although, in general, communications towers may not have an impact in a general area, such towers may have a potential impact of a specific nature on abutting residential property,

---

**12.** Counsel for OPM – USA, INC. objected to the information presented by Commissioner Higgs after the public hearing had been closed (R–146–147). Counsel for Defendant then stated "I'm not sure that's going to be the determining factor in what the final order will say anyway. So, I wouldn't get too concerned about it." (R–147).

particularly where such a tower isn't buffered or is too close to the abutting residential properties for effective buffering;

7. Based upon aerial photographs presented showing a hot air balloon elevated to the height of the proposed tower at the proposed location of the tower on the 20–acre site, the Board finds that such a tower would be plainly visible from the abutting residential property and that such a tower would be totally foreign to the natural and community aesthetics of the residential neighborhood;

8. The two other telecommunications towers are visible from the entrance to the abutting residential neighborhood (Spruce Hills Subdivision);

9. That one of the towers visible from the Spruce Hills Subdivision entrance is approximately 2400 feet away and is much smaller in size than the proposed tower which is the subject matter of the CUP application.

10. That the other tower visible from the Spruce Hills Subdivision entrance is approximately one-half mile away in the vicinity of the intersection of SR 46;

11. That the proposed setback of the tower from the property line is 200 feet;

12. That an engineer has certified that the tower would fall within the confines of the site boundaries in the event of a failure.

CONCLUSIONS OF LAW

1. The Board finds that the evidence presented fails to demonstrate compliance with Section 62–1901(c)(1) for the following reasons:

a. The proposed use is not compatible with the character of the surrounding residential property due to:

(1) the proximity of the tower to the abutting residential property (600 feet)

(2) the 400–foot height of the tower cannot be effectively screened or buffered from view from the abutting residential property;

(3) the unsightly appearance of the tower at a location so close to the abutting residential property;

(4) the potential for a decrease in property values as a consequence of the proximity of the proposed 400–foot tower to surrounding residential property;

(5) the cumulative effect of a third tower at a point so close to the entrance of the Spruce Hills Subdivision.

ACTION

Based upon the foregoing findings of fact and conclusions of law:

BE IT RESOLVED BY THE BOARD OF COUNTY COMMISSIONERS OF BREVARD COUNTY, FLORIDA that the application for Conditional Use Permit filed by Robert E. Smith, Walter A. Cerrato, Jr. and Walter A. and Marie R. Cerrato (Z–9701110) for a 400–foot telecommunications tower be, and the same is, hereby denied.

On May 15, 1997 just prior to the hearing scheduled in this case, Defendant filed another version of Resolution 97–54 (which had been dated May 13, 1997), which changed the "Conclusions of Law" to the following:

CONCLUSIONS OF LAW

1. The Board finds that the evidence presented fails to demonstrate compliance with Section 62–1901(c)(1) for the following reasons:

a. The proposed use is not compatible with the character of the surrounding residential property due to:

(1) the proximity of the tower to the abutting residential property (600 feet)

(2) neither the 400–foot nor 340 foot proposed height of the tower can be effectively screened or buffered from view from the abutting residential property;

(3) the unsightly appearance of the tower at a location so close to the abutting residential property;

(4) the potential for a decrease in property values as a consequence of the proximity of the proposed 400–foot or 340 foot tower to surrounding residential property;

(5) the cumulative effect of a third tower at a point so close to the entrance of the Spruce Hills Subdivision;

(6) this proposed commercial use is inconsistent with the comprehensive plan's wetland policies.

ACTION

Based upon the foregoing findings of fact and conclusions of law:

BE IT RESOLVED BY THE BOARD OF COUNTY COMMISSIONERS OF BREVARD COUNTY, FLORIDA that the application for Conditional Use Permit filed by Robert E. Smith, Walter A. Cerrato, Jr. and Walter A. and Marie R. Cerrato (Z–9701110) for a 400–foot or 340–foot telecommunications tower be, and the same is, hereby denied.

(Docket No. 15, Exhibit 16).[13]

### CONCLUSIONS OF LAW

The Telecommunications Act ("TCA") was signed into law on February 8, 1996. The TCA is expansive legislation designed primarily to increase competition in the telecommunications industry. The TCA provides, in part:

(B) Limitations

(I) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof—

. . .

(II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

. . .

(iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

(iv) No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.

(v) Any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction. The court shall hear and decide such action on an expedited basis ...

47 U.S.C. § 332(c)(7)(B).

Plaintiff OPM timely filed the instant action in this Court within thirty (30) days after Defendant Board denied OPM's application for a conditional use permit to construct a communications tower. OPM seeks an Order from this Court directing the Board to issue the conditional use permit to OPM for its communications tower. Thus, this Court must determine whether the Board's decision to deny OPM's application was supported by "substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii).

"The phrase 'substantial evidence contained in a written record' is the traditional standard used for judicial review of agency actions." H.R. Conf. No. 104–458, 104th Congress, 2d Sess. 208 (1996). Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *BellSouth Mobility Inc. v. Gwinnett County, Georgia,* 944 F.Supp. 923, 928 (N.D.Ga.1996) (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951)). Continuing, the Court in *BellSouth Mobility* stated:

Although the court is not free to substitute its judgment for that of the board of commissioners, it must overturn the board's decision under the substantial evidence test if it "cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view."

13. Plaintiff moved to strike this Amended Order (Doc. No. 17, filed May 15, 1997), which motion was denied by Order entered July 14, 1997. (Doc. No. 35).

*Id.* (quoting *Bickerstaff Clay Products Co., Inc. v. N.L.R.B.,* 871 F.2d 980, 984 (11th Cir.1989)).

■ Following the standard set forth above, this Court finds that the Board's decision to deny OPM's application for a conditional use permit was not supported by substantial evidence contained in the written record. Instead, the Board adopted inconsistent findings of fact and conclusions of law which are not supported by the record in order to justify its decision to deny OPM's conditional use permit.

In paragraph six (6) of its findings of fact, the Board stated that based on OPM's expert witness Ron Krause it found that "although, in general, communications towers may not have an impact in a general area, such towers may have a potential impact of a specific nature on abutting residential property, particularly where such a tower isn't buffered or is too close to the abutting residential properties for effective buffering." Thus, the Board's conclusion of law number (a)(4) states that there is a potential for a decrease in property values as a consequence of the proximity of the proposed 400 foot or 340 foot tower to surrounding residential property.[14]

The Board's conclusion that there is a potential for a decrease in property values to surrounding residential properties is not supported in the written record. As noted in the facts section above, Mr. Krause, who was the only expert to testify in front of the Board regarding surrounding property values, specifically concluded that this particular tower at the proposed location would have no adverse effect on the property values of the nearby residential properties. (R–104–105). Though some surrounding property owners spoke to the Board and others wrote letters expressing concern that their property values would diminish, no evidence was presented which would contradict Mr. Krause's conclusion.

The Board's conclusion that the tower would cause the potential of a decrease in nearby property values is wholly unsupported by any evidence in the record before the Board and before this Court. The Court finds that an unsupported and hypothetical "potential" for a decrease in property values is insufficient to warrant denial of OPM's application.

Next, the Board states in paragraph seven (7) of its findings of fact that the tower in question would be plainly visible from the abutting residential property and that such a tower would be totally foreign to the natural and community aesthetics of the residential neighborhood. Initially, the Court notes that it would be a rare event to be able to buffer a communications tower so that it is not visible at all. Further, the evidence demonstrates that the communications tower would not be totally foreign to the aesthetics of the neighborhood since there are two other towers within view. Thus, paragraph seven (7) of the Board's findings of fact is inconsistent with paragraphs eight (8) through ten (10), which explain the location of the two other towers and the fact that they are visible from the entrance of the Spruce Hills Subdivision.

The conclusions of law stated by the Board are also inconsistent or insufficient to deny the conditional use permit for this communications tower under the TCA. The Board found that the proposed use was not compatible with the character of the surrounding property for a number of reasons. First, the Board noted that the tower would be located only six hundred (600) feet from the abutting residential property. However, this must have been a comment only on the aesthetics of the tower because the Board stated in its findings of fact that an engineer certified that in the event of a failure the tower would fall within the confines of the site on which the tower was located. Thus, there was no evidence presented of any valid safety considerations with nearby residences. Further, there was no evidence presented of any minimum required distance in Brevard County between towers and nearby residences.[15]

---

14. The Court notes that the Board's amended resolution used interchangeably both the 400 and 340 feet height though OPM clearly stated that the height of the tower would not exceed 340 feet.

15. Though Commissioner Higgs continually made reference to discussions about Orange County creating minimum distance requirements of five hundred (500) times the height of the tower between residences and towers, there is no

Next the Board found that the tower could not be "effectively" screened or buffered from the view of abutting residences. As discussed above, there are two other nearby towers which are not completely screened from these same residences. Further, OPM presented evidence that there is adequate buffering since there is a heavily wooded area located between the proposed tower site and the adjoining residences.

Next the Board addressed the "cumulative effect" of a third tower so close to the Spruce Hills Subdivision. The Court finds this conclusion to be hollow in view of the significant amount of evidence that the tower would avoid a proliferation of towers in the area. OPM presented evidence that its tower had the ability to house sixty (60) users. Thus, the practical effect of this tower would be to reduce the number of future towers needed in this particular area. The Court notes that towers cannot always be compatible with the character of the surrounding property. If this were so, all towers would be grouped together. However, in order to meet the increasing demand by consumers for wireless services, telecommunications towers have to be separated and located in areas in which they have not been traditionally located, such as residential, commercial, and rural areas.

Finally, the Board found in its amended memorandum that the proposed commercial use was inconsistent with Brevard County's Comprehensive Plan Wetland Policies. Defendant argues that OPM failed to meet its legal burden of proving to the Board, by substantial competent evidence, that the application for the communications tower conditional use permit was consistent with wetlands policies of the Brevard County Comprehensive Plan. This reason appears to be an after-the-fact excuse made by the Board without substantial evidence in the record to support it and merely to justify its earlier decision to deny OPM's application without alerting OPM or giving it the opportunity to object or to present evidence on the wetlands issue.

Defendant argues that the only evidence the Board had in the written record before it was the staff's report that the proposed site was within a wetland and that towers are a commercial use not permitted in a wetland by the Comprehensive Plan and County Code. However, OPM did present evidence to the Board regarding the wetlands issue. First, Ms. Hansen explained that the tower would not be located in the wetlands but instead would be placed on the uplands portion of the site. This is reflected in paragraph five (5) of the Board's findings of fact. The only evidence in the written record before the Board of the tower being located in a wetland was a drawing of the site showing one guy wire of the tower extending into the wetland. Ms. Hansen also explained that OPM would place a conservation easement on the rest of the twenty (20) acre site so that there would be no other development besides the tower. Further, the County Planning and Zoning Board, the staff of which made the comment about the tower being a commercial use which is not permitted in a wetland, unanimously approved the request for a conditional use permit for a 400 foot tower.

As explained in the facts above, the Planning and Zoning Board approved the conditional use permit after hearing comments by Richard Enos, a zoning official for the Brevard County Board of County Commissioners. Mr. Enos stated that typically the issue of whether towers are a commercial use allowed in a wetland are handled at the site plan stage and not at the zoning stage. After further questioning, Mr. Enos reiterated that wetlands issues are not typically dealt with at the zoning stage unless the county is "100% sure" there are wetlands. Finally, Mr. Enos stated that the only reason the wetlands issue is brought up at the zoning hearing is to make sure the applicant is aware that even if they get the zoning, they may run into a problem when they get to the site plan stage. "Mr. Enos added that [OPM] is aware of that."

OPM agrees with Mr. Enos that it was aware that the wetlands issue would arise at the site plan stage which occurs after the

evidence that this was a requirement in Brevard County, or that it had ever been suggested in Brevard County before the February 20 hearing. Such requirement would have questionable va-

lidity under the Telecommunications Act, particularly as to towers that are to be constructed in urban areas.

conditional use permit is granted, and it argues that it relied on that statement.[16] Further, OPM states that it relied on the process used to approve another tower ("the Kugel site")[17] which was located in 100% wetlands and which received a conditional use permit from the Board without discussion of the wetlands issue.[18] Instead, for the Kugel site, the applicant dealt with wetlands issues after the conditional use permit was granted and during the site plan stage when a staff report was prepared which analyzed the proposed tower under Brevard County's Wetlands Policy 5.2(F)(2). *See* Doc. No. 23, pg. 17.[19] The application was then heard by the Board for a determination of public interest under Policy 5.2(F)(2). This is clearly a different procedure than the procedure applied by the County to OPM in this case.

■ Defendant further argues that the procedure utilized for the Kugel site tower was more arduous and time consuming than the procedure utilized by the County in this case, and thus it is somehow an argument against its interest for OPM to request the same procedure as that used for the Kugel site to be used in this case. However, based on the process utilized in the Kugel tower site permitting process and the comments by Mr. Enos before the Planning and Zoning

Board in this case, it was reasonable for OPM to rely on the Kugel procedure as the procedure authorized by the County. Further, the record reflects that OPM was prepared to present more evidence to the Board regarding the location of the instant tower in wetlands at the hearing on its conditional use permit application. As noted earlier, on two occasions at the February 20 hearing OPM offered the testimony of Joe Young, a wetlands expert, to comment on the impact of the tower, if any, on wetlands. The Board did not have any questions for Mr. Young nor did it give indication that it would base its denial of OPM's application based on the wetlands issue.

■ The Court also finds that OPM has not failed to meet its burden of demonstrating that its proposed tower does not follow the Comprehensive Plan because of any alleged failure to present the testimony of Mr. Young. The procedure of having the applicant present all of its evidence at the conditional use permit hearing is not the typical procedure followed in Brevard County. For example, less than half way through the transcript of the February 20 meeting, Chairman O'Brien commented that the applicant (OPM) had basically used up its time. This was in

**16.** Mr. Enos' statement in his deposition that the wetlands consistency issue was before the Board in the instant case and that the applicant was required at that time to demonstrate that the application was consistent with the comprehensive plan as it applied to wetlands is directly contrary to Mr. Enos' statements to the County Planning and Zoning Board and with the procedure utilized by the County in approving the Kugel site. *See* Doc. No. 44, pg. 88. Though the Board may have been able to deal with the wetlands issue at the conditional use permit stage, the Board chose not to deal with it.

**17.** The issue of the procedure utilized by Brevard County in approving an application to construct a communications tower on the Kugel site arose in this case when contrary assertions were made by counsel for the respective parties at a previous hearing. At that hearing, this Court was attempting to discern the procedure utilized by the County for approving communications towers which were partially located in wetlands. Counsel for Defendant stated that no application to construct a communications tower had been approved by the County in wetlands, while counsel for Plaintiff stated that an application to con-

struct a communications tower located entirely in a wetland had recently been approved by the County. The Court then requested that the parties provide evidence to support their respective assertions. The attorney for the County objected to any evidence being presented by OPM to the effect that the County had approved one or more towers to be constructed in wetlands, contrary to his assertion. Thus, OPM presented evidence that the Kugel tower had previously been approved by the County for construction entirely in wetlands.

**18.** In his deposition, Richard Enos noted that the Kugel site received unanimous approval by the Board for a conditional use permit even though the Natural Resources staff report stated that this was a commercial use prohibited in wetlands. (Doc. No. 44, p.s. 34–35).

**19.** Mr. Enos stated during his deposition that if OPM was granted a conditional use permit in the instant case, in the normal course of events the applicant would have gone to the Natural Resources Office as part of the site plan process for a more detailed review with regard to the impact to wetlands. (Doc. No. 44, pg.66).

the middle of OPM presenting its second witness. (R–114–116). Commissioner Scarborough commented that OPM should continue to the extent that they "have something that's educating us and we have questions, I don't want to rush this discussion." (R–116). Commissioner Scarborough later commented that the Board was "deviating from what we normally do." (R–124). However, no one but Ms. Hansen ever brought up any wetlands issue, and the commissioners never asked any questions of Mr. Young, OPM's wetlands expert. Thus, OPM cannot be blamed for not presenting evidence that was not requested and which it otherwise did not believe was relevant to the conditional use permit application process.

Accordingly, the Court finds that the Board's decision was not based on substantial evidence in the written record. Instead, the Court finds that OPM did everything possible to support its application for a conditional use permit. It appears from the record that there is nothing OPM could have done which would have met with the approval of the Board. OPM lowered the height of its tower from 400 to 340 feet, planned to build a less intrusive pylon tower instead of a larger lattice-type tower, planned to locate the tower in the uplands to avoid wetlands and then offered to move the site for the tower to wetlands so that it would be located further from abutting residences, offered a conservation easement on the remaining portion of the land, ensured that the fall radius of the tower would be solely within the confines of the property, offered to have the conditional use permit lapse within six months if construction on the tower did not begin, and offered to remove the tower if it was ever abandoned for more than six months. Instead, it appears that the Board made its decision to deny the application and sent its staff off to create written reasons to support such decision and to attempt to comport with the Telecommunications Act.

On presentation of the matters to the Court, the County's decision to deny OPM's application must be supported by substantial evidence contained in a written record. 47 U.S.C. § 332(c)(7)(B)(iii). Not only is there a lack of substantial evidence in the record to support the Court's decision, but also the evidence shows affirmatively that reasons given by the County to support its decision are directly contrary to the evidence. In such situation, the action of the County cannot be affirmed under the Telecommunications Act. *See, e.g., Illinois RSA No. 3, Inc. v. County of Peoria*, 963 F.Supp. 732 (C.D.Ill. 1997); *Western PCS II Corp. v. Extraterritorial Zoning Authority*, 957 F.Supp. 1230 (D.N.M.1997); *BellSouth*, 944 F.Supp. 923.

Based on the foregoing, Plaintiff's request for relief under the TCA is **GRANTED.** The Court Orders the Board to issue OPM a conditional use permit within twenty (20) days from the date of this Order. OPM then must proceed to have its application considered under the County's site plan stage where the wetlands issue can be adequately addressed as it was with the Kugel property, and if necessary, a public interest determination may be made by the Board at that time. The Court will reserve jurisdiction over this matter throughout the remainder of the County's approval process. Further, OPM's remaining claims for due process and equal protection violations will proceed as a typical Track II case.

Upon consideration, Plaintiff's Motion for Attorneys' Fees and Costs (Doc. No. 32) is **DENIED,** Brevard County's Motion for Extension of Time (Doc. No. 36) is **DENIED** as **MOOT,** and Plaintiff's Motion for Leave to File the Deposition of Richard Enos (Doc. No. 40) is **DENIED** as **MOOT.**