Omnipoint Comm. v. Town of Amherst    CV-97-614-JD  08/21/98 P

UNITED STATES DISTRICT COURT FOR THE
                       DISTRICT OF NEW HAMPSHIRE

Omnipoint Communications
Enterprises, Inc.

        v.                              Civil No. 97-614-JD

The Town of Amherst,
New Hampshire


                M E M O R A N D U M   O P I N I O N


     The plaintiff, Omnipoint Communications Enterprises, Inc.

("Omnipoint"), brought this action against the defendant, the

Town of Amherst, New Hampshire ("Town" or "Amherst").  The

plaintiff alleges that the defendant violated the Telecommuni-

cations Act of 1996 ("TCA"), Pub. L. No. 104-104, 110 Stat. 56

(1996), in connection with the plaintiff's attempt to locate

personal communication service ("PCS") facilities in Amherst.

Before the court are the defendant's Rule 12 motion (document no.

17), the plaintiff's motion for summary judgment (document no.

6), and the defendant's cross-motion for summary judgment

(document no. 20).


                          Background[1]

     On April 28, 1997, the federal government granted the

_____

     [1]As discussed more fully _infra_, the facts material to the
resolution of this case are undisputed.

plaintiff a license to provide PCS services in the New England region, including southern New Hampshire.[2] By the terms of the license, the plaintiff must provide PCS services to 25% of the population in the covered region by April 28, 2002, and 50% of the population in the covered region by April 28, 2007. This lawsuit stems from the defendant's denial of the plaintiff's applications for special exceptions and variances for its proposed PCS system in Amherst.

The Town of Amherst is a predominately rural community with an historic village that is listed on the National Register of Historic Places. Route 101 runs through the Town and is one of the most important travel corridors in New Hampshire. The Town's unique topography limits the available design options for a PCS system that will effectively serve both the residents and commuters on Route 101. Amherst has attempted to preserve its rural character and doing so is a stated goal of Amherst's Master Plan.[3]

---

[2]The record indicates that PCS, the term used by the plaintiff in its submissions to the court, is a subset of personal wireless services ("PWS"), the term used by the TCA. For the purposes of this order, the two terms are functionally equivalent.

[3]The Amherst Master Plan is not part of the record before the court, but undisputed evidence in the record supports the conclusion that the goals of the Amherst Master Plan include preserving the Town's rural character, particularly along the

The TCA was signed into law on February 8, 1996.  See <u>Sprint</u> <u>Spectrum L.P. v. Town of Easton</u>, 982 F. Supp. 47, 49 (D. Mass. 1997).  Among its other effects, the TCA imposed limits on the ability of local governments "to make decisions regarding the placement of wireless communications service facilities within their borders."  <u>Id.</u> (quoting <u>BellSouth Mobility, Inc. v.</u> <u>Gwinnett County</u>, 944 F. Supp. 923, 927 (N.D. Ga. 1996)).  In an effort to comply with the TCA's requirements, in March 1997, the defendant adopted a warrant article giving the members of the Amherst Board of Selectmen (the "Selectmen") authority to use Town property for siting telecommunications facilities.  In addition, Amherst adopted a zoning ordinance governing the placement of PCS facilities within the Town.

The Amherst zoning ordinance does not allow telecommunications towers to be placed anywhere in the Town as of right.  It prohibits their siting in four zones, in which towers can only be placed pursuant to a use variance, and provides for their siting in four other zones through the grant of a special exception.[4]

_____

northern entrance to the Town.

[4]The four zones in which PWS facilities are prohibited without a use variance are as follows:  Floodplain, Wetland Conservation District, Watershed Protection District, and Historic District.  PWS facilities are allowed only by special exception in the following four zones:  Residential/Rural, Northern Rural, Northern Transitional, and Industrial.

In order to qualify for a special exception, an applicant must show that the site satisfies the purpose of the zoning ordinance, which is as follows: "To prevent the development of a proposed facility in areas that are unsatisfactory and will interfere with the view from any public land, natural scenic vista, historic building or district or major view corridor."

In addition, the zoning ordinance imposes setback requirements for telecommunications towers. Towers must be set back at least five hundred feet from Route 101. They must also be set back a distance equivalent to twice the height of the tower from any residential property line and a distance equivalent to the height of the tower from other kinds of property. In order to place a 190-foot high PCS tower on a lot contiguous to Route 101 and meet the setback requirements, the parcel would have to be a minimum of approximately fourteen-and-one-half acres.[5] For smaller towers, smaller lots could comply with the setback requirements. To be exempted from the setback requirements, a

--------

[5]The plaintiff has calculated the minimum required lot size to be as large as seventeen acres, but the theoretical minimum lot size is immaterial. Because of additional requirements of lot shape and topography, the actual size required for a suitable site could be substantially larger than the theoretical minimum. In addition, the record is silent as to the existence of available parcels of land that could accommodate a PCS system in a way that provides adequate coverage without the need for setback variances.

PCS provider must obtain a setback variance.

To qualify for a variance, an applicant must demonstrate the following factors: (1) failing to grant the variance would cause hardship to the applicant; (2) granting the variance would not violate the spirit and intent of the ordinance; (3) granting the variance would not diminish surrounding property values; (4) granting the variance would result in a benefit to the general public; and (5) granting the variance would result in substantial justice to the applicant.

Pursuant to the warrant article, the Selectmen placed a newspaper advertisement soliciting interest from PWS providers who were considering locating a system in Amherst. On or about April 1997, the Selectmen entered negotiations with the plaintiff concerning the construction of PCS towers on Town land. The digital technology used by the plaintiff provides clearer reception than cellular service, but requires that towers be closer together to provide coverage. The plaintiff designed its system with input from the Selectmen to address issues about which they expressed concern. In particular, because the Selectmen sought to avoid a proliferation of towers and to increase Town revenue, the plaintiff increased the height of its proposed towers to allow colocation with other PCS providers. The proposed towers would thus allow up to four other PCS

5

providers to utilize the same towers, and the Town would receive a portion of the revenue from providers colocating on towers situated on Town owned land.

After several months of negotiations, the plaintiff and the Selectmen reached an agreement on a system design that utilized 190-foot-high towers on four sites, three of which were on Town-owned land. On August 27, 1997, the Selectmen and the plaintiff entered leases on the following three Town-owned sites: the Bragdon Farm site, the municipal recycling center site, and the public safety complex site. The plaintiff also planned to utilize the privately owned Christ's Church site for the fourth tower.[6]

The Bragdon Farm site consists of 59.3 acres that the Town obtained, in part, with Conservation Commission funds. Approval for a tower on the site under the current zoning ordinance requires a special exception because of its location in the Northern Transition zone. Despite the site's large size, two setback variances are required for the proposed tower site because the defendant requested that the plaintiff locate the

---

[6]During the course of the negotiation and approval process for its permanent PCS system, the plaintiff also sought and received permission to attach an antenna to the existing Pennechuck water tower at a fifth site to provide temporary service. The antenna is visually unobtrusive and the approval for its erection was prompt and uncontroversial.

tower behind a stand of old growth trees in proximity to the property line to shield the tower from view. The tower could be constructed on the lot without setback variances if it were placed in open fields in the middle of the property, but then it would be more visible.

The municipal recycling center site consists of twenty-seven acres subject to restrictive covenants prohibiting commercial development over much of the property and containing a capped landfill which cannot support the construction of a tower. Approval for a tower on the site requires a special exception because of its location in the Northern Rural zone. Given the restrictions on the site, options for locating a tower are limited. The proposed tower location requires two setback variances, one from Route 101 and one from an adjacent residence.

The public safety complex site is located within the Town's Historic District and currently houses the police and fire departments, which use an eighty-five to ninety-foot-high communications tower located on the site. The proposed tower would replace the existing tower and provide an upgrade of the municipal police and fire communications systems funded by the plaintiff. Approval for a PCS tower on the site requires a use variance because of the site's location within the Historic District, where towers are not a permitted use. In addition, the

7

proposed tower location requires setback variances from two lot lines and from Route 101. Finally, the project, like all projects conducted within the Historic District, requires the approval of the Amherst Historic District Commission ("HDC").

The Christ's Church site is a twenty-two acre parcel of irregular shape. Location of a tower on the site requires a special exception because it is located in the Rural Residential zone. The parcel's shape makes it impossible to locate the proposed tower without a setback variance. The initial proposed location invaded setbacks to abutting residences and, at the residents' request, the plaintiff moved the proposed site so that it only requires a setback variance from Route 101.

The license agreements entered by the plaintiff and the defendant on the Town-owned sites contain the following disclaimer:

> The [defendant] makes no warranties or representations regarding the proposed use and its compliance with local zoning or planning codes. Its is expressly understood that it shall be the sole responsibility of the licensee to procure any and all applicable approvals or permits that may be necessary to construct the contemplated facility on the licensed premises and abutting premises. The licensor shall not be responsible for procuring or assisting the licensee in obtaining the same except to indicate that it has no objection to the granting of the same. However, failure to obtain any permit or approval necessary to construct said tower shall be cause to permit the licensee to declare this agreement terminated on the giving of 30 days written notice.

8

Pl.'s Mem. of Law in Supp. of Mot. for Summ. J., Gawelek Aff., Exs. 3-5, Section 24.  Despite the fact that they were not required to do so, the Selectmen sent a letter to the ZBA expressing their support of the plaintiff's applications for the system as designed.

On September 3, 1997, the plaintiff submitted an application for the public safety complex site to the HDC.  On September 4, 1997, the plaintiff submitted applications for the required special exceptions and variances on all four sites to the Amherst Zoning Board of Adjustment ("ZBA").[7]  On September 15, 1997, the HDC conferred in a non-public session.  According to the plaintiff, it determined at this point to oppose the public safety complex application.

The ZBA met on September 16, 1997.  ZBA Member Rowe moved that the matter be deferred until December, so that more information could be obtained, but this proposal was defeated.[8] The plaintiff made a presentation to explain and support its

---

[7]The plaintiff's initial filing was supplemented and modified so that it was not complete until November 3, 1997.  In addition, until November 12, 1997, the plaintiff provided conflicting information about the number of tower locations its proposed system would ultimately require.

[8]Rowe abstained throughout the ZBA's deliberations from consideration of the plaintiff's applications with respect to the public safety complex site because his wife is the Chair of the HDC.

applications.  It discussed the sites and the permits needed for each site, answering questions from the ZBA members, who requested further information.  The meeting was then opened for public comment.  Eventually, the hearing was suspended until the October meeting.

The HDC met in public session on September 18, 1997.  The plaintiff assumed, in keeping with the normal practice of the HDC, that its HDC application would not be acted upon at that time because the ZBA had not acted upon the underlying applications.  For that reason, the plaintiff did not attend the HDC meeting.  At the meeting, however, the HDC denied the plaintiff's request for approval to install a tower at the public safety complex site without the benefit of a presentation by the plaintiff.  The HDC members authored a letter to the ZBA indicating their "unanimous opposition to the erection of a communications tower" at the public safety complex site.  Pl.'s Mem. of Law in Opp'n to Mot. to Dismiss, Ex. A.  The HDC denial was predicated on members' determination that the proposed tower "would not be visually appropriate," could not be screened from view, would be "totally out of scale with anything else" in the Historic District, and would not "preserve the distinctive character and integrity of the district."  Id.; Gawelek Aff., Ex. 12.

The ZBA met again on October 21, 1997. In addition to the prior applications, the plaintiff sought an appeal from the HDC's denial relating to the public safety complex site. The plaintiff provided additional information that had been requested at the September meeting and made a further presentation of the benefits of its plan. ZBA Member Kirkwood raised the possibility that the plaintiff might better meet the goals of the Amherst Master Plan by having more, smaller towers. ZBA Member Rowe asked about whether the applications met the Warrant Article requirements for being seen from the "natural scenic vista, historic building or district or major view corridor" and whether the proposed towers were compatible with the Master Plan. The meeting was opened for additional public comment and because the matter was not concluded, the hearing was continued until the ZBA's November meeting.

The ZBA met again on November 18, 1997. ZBA Chairman Buchanan opened the subject of the applications by noting that the ZBA had received more information on the plaintiff's proposals than on any other project in town, noting that the ZBA had received petitions with almost two hundred signatures requesting that alternatives be found to towers, and requesting that public comment be limited to new issues not discussed in previous meetings. After extensive additional public comment, at

the end of the meeting the ZBA found that the applications constituted a regional impact pursuant to the New Hampshire regional impact statute, N.H. Rev. Stat. Ann. ("RSA") § 36:56 (Supp. 1997), and deferred deliberation and decision on the applications until the December meeting to allow input on the regional impact issue. The ZBA announced that there would be no further presentation by the plaintiff and no further public testimony.

The plaintiff filed its initial complaint in this action on December 8, 1997. It alleged a violation of the TCA based on the defendant's delay in deciding on its applications. The ZBA met again on December 16, 1997. At that time, it briefly discussed the issue of regional impact and began deliberations on the applications. ZBA Member Rowe submitted typewritten motions that had been prepared prior to the meeting that recommended the denial of all the applications. The applications, including the appeal from the HDC decision, were all denied unanimously. At the time, the written record included the minutes of the meetings, the motions prepared by ZBA Member Rowe, and various materials submitted both by the plaintiff and by members of the public.

On January 2, 1998, the plaintiff amended its complaint to encompass the ZBA's denial of its applications. It also

requested that the ZBA reconsider its denial of the applications and grant a rehearing. On January 8, 1998, the plaintiff moved for summary judgment. The ZBA held a special hearing on January 12, 1998, at which it decided to let the plaintiff address points raised in the application for rehearing.

On February 17, 1998, the ZBA held the rehearing of the plaintiff's applications. The plaintiff elected not to adduce additional evidence in support of its application, pointing out that the ZBA had not addressed any additional questions to it and resting on the record that had been developed. The ZBA expressed dissatisfaction that the plaintiff had sought a rehearing and failed to come forward with more information. It then accepted additional evidence from the public.

Public comment on the applications over the course of the meetings was, on balance, overwhelmingly negative and expressed numerous concerns. Among other issues, residents questioned the appropriateness of the applications, expressed a desire to delay the applications and slow down the process, expressed concern about a possible diminution of the value of surrounding property, questioned whether Amherst residents needed the towers or whether the plaintiff was merely attempting to serve the transient commuters on Route 101, and expressed a preference that the plaintiff employ either a different technology entirely or a

13

means of making the proposed towers less obtrusive.  The plaintiff attempted to respond to these concerns.  For example, in response to a suggestion that the plaintiff use shorter "artificial tree" type towers which would be less visually obtrusive, the plaintiff responded that this would defeat the goal of colocation espoused by the Selectmen and cause a proliferation of towers, which it believed the Town did not want. In many instances, the plaintiff indicated that the alternatives requested by residents were not technologically feasible for deployment in Amherst given its topography.[9]

One serious point of contention concerned the issue of whether the proposed towers would have a deleterious effect on surrounding property values.  The plaintiff commissioned a study of property values in other communities by Craft Appraisal Associates, Ltd.  The study indicated that although the limited data made it difficult to draw reliable conclusions, there was no evidence of decreased property values because of towers in other communities, no appraiser had lowered an appraisal because of a nearby tower, and no resident had asked for an abatement of real

_____

[9]On November 24, 1997, Amherst held a workshop with a telecommunications consultant whose opinion as to the options for deploying PWS services in Amherst largely confirmed the plaintiff's opinion that the feasible options for design of a PCS system in Amherst were limited.

14

estate taxes because of the installation of a tower in the vicinity. In response, Amherst real estate brokers submitted letters criticizing the results of the study and opining, based on their experience and common sense, that the existence of towers would have a negative effect on surrounding property values.

On March 5, 1998, the ZBA deliberated on the motion for rehearing. On March 16, 1998, it issued its final denial to the plaintiff with a more extensive written opinion that incorporated the initial, shorter denial. The ZBA found generally that the plaintiff had failed adequately to support its applications, to research other technologies, or to demonstrate that the proposed towers were anything more than the most financially expedient solution for the plaintiff. It also found that the plaintiff's primary interest was in providing service "for the transient public along the Route 101 corridor, and in such a way that minimizes its cost and maximizes its profit without consideration to spirit and provisions [sic] of the Amherst Zoning Ordinance." Def.'s Objection to Pl.'s Mot. for Summ. J., Ex. 2D, Attach. 1 ("Decision"), at 12. The ZBA also criticized and rejected the conclusion of Craft Appraisal's report opining that there would be no diminution of property values connected with the towers. By "applying the Board's common sense" to the conflicting

15

evidence on this point, the ZBA concluded that the towers would have a detrimental effect on nearby residential property. Id. at 10.

The written opinion also made findings with respect to the specific sites proposed. With respect to the Bragdon Farm site, the ZBA made the following findings: no evidence in the record established that this area is not suitable for uses for which it is currently zoned; no evidence in the record established that a tower cannot be placed within the setback requirements of the site; the proposed tower would be visible from various roads in Amherst and Bedford, including Route 101; the proposed tower did not "meet the spirit and intent of the Amherst Master Plan to maintain the rural character of the northern entrance to the Town"; and the proposed tower would be contrary to the specific intent of the zoning ordinance to "prevent the development of a proposed facility in areas that are unsatisfactory and will interfere with the view from any public land, natural scenic vista, historic building or district or major view corridor." Id. at 5. With respect to the municipal recycling center site, the ZBA found that the applications lacked detail and that the land is suitable for the use for which it is zoned and currently used, a municipal landfill. With respect to the public safety complex site, the ZBA made the following findings: the site can

16

be and is used for purposes other than the requested tower; the plaintiff failed to present evidence that a denial of the variance renders the property unsuitable for any permitted use; the plaintiff failed to present evidence that the spirit and intent of the Master Plan would be maintained by the grant of the variance; the tower would be visible from locations within and outside the Historic District; the plaintiff failed to present evidence that the proposed tower meets the objective of maintaining the rural character of the Town by siting facilities where they will not interfere with the view of public and private land; the plaintiff failed to demonstrate that the proposed tower would not cause a diminution in the value of the surrounding property; "[t]he tower configuration is found not to be in the public interest" because "the Town has spent significant funds maintaining the rural and attractive entrance to, and character of the Town, along Route 101" which would be undermined by the proposed tower; and "[c]onflicting evidence was offered regarding whether technology is available to allow telecommunications facilities to be installed in Amherst in keeping with the Town ordinances."[10]  Id. at 8.  With respect to the Christ's Church

---

[10]In regard to the appeal of the HDC denial, the ZBA found that the plaintiff's objections to the HDC denial were unrelated to the criteria relevant to the HDC decision, which were correctly applied by the HDC.

17

site, the ZBA found that the applications failed to establish that the proposed site was unsuitable for permitted uses and that the proposed tower would be visible from Route 101.

The rationale of the ZBA's rejection of the proposed towers is best exemplified by the following statement:

> Siting of these enormous towers in full view of the traveling and local populace would adversely impact the general welfare of the Town and particularly the residents nearby.  These behemoths would be a blight upon a pastoral and rural area which has been and hopefully will continue to be a source of comfort and relaxation for its inhabitants who have chosen to live in and maintain this scenic and bucolic atmosphere.

Id., Attach. A, at 4.  The ZBA's denial seems to indicate that the plaintiff must screen any proposed towers entirely from view, establish that the only viable use for a parcel is as a site for a PCS tower, and prove that a tower would not cause a diminution in surrounding property values in order to secure approval of future PCS tower applications.

On March 27, 1998, the plaintiff filed a second amended complaint extending its claims of a TCA violation to the ZBA's denial on rehearing.  Since that time, the defendant has filed both a Rule 12 motion and a cross-motion for summary judgment.


Discussion

The TCA was signed into law on February 8, 1996.  See Sprint

18

Spectrum L.P. v. Town of Easton, 982 F. Supp. 47, 49 (D. Mass. 1997). It was passed

> in order to provide a pro-competitive, deregulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services to all Americans by opening all telecommunications markets to competition. More specifically, with this Act, Congress had tried to stop local authorities from keeping wireless providers tied up in the hearing process.
>
> The legislative history evidences clear Congressional intent to take down the barriers to telecommunications. . . .
>
> Recognizing that such sweeping changes in the industry may be met with resistance, federal lawmakers limited the ability of state and local officials to delay implementation of the TCA. Specifically, Section 704 of the TCA states that actions taken by State or local governments shall not prohibit, or have the effect of prohibiting, the placement, construction or modification of personal wireless services.

Id. at 49-50 (quotations, citations, and alterations omitted).

Subsection 7 of 47 U.S.C. § 332 is captioned "Preservation of local zoning authority." See 47 U.S.C.A. § 332(7) (West Supp. 1998). It provides, in relevant part, as follows:

(A) General Authority

> Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.

(B) Limitations

19

(i)  The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof—

(I) shall not unreasonably discriminate among providers of functionally equivalent services; and

(II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

(ii)  A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request.

(iii)  Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

. . . .

47 U.S.C.A. § 332(7)(A)-(B) (West Supp. 1998).  Although Congress in section A purportedly preserved local governmental authority over placement, construction, and modification decisions, that authority is clearly curtailed by the provisions of section B. The TCA works sweeping changes in local zoning authority because it "clearly preempts any state regulations 'which conflict with its provisions.'" Lucas v. Planning Board of LaGrange, No. 98 CIV. 0862(CLB), 1998 WL 261566, at *9-10 (S.D.N.Y. May 19, 1998)

20

(holding provisions of New York State Environmental Quality Review Act invalid as preempted by TCA) (quoting Easton, 982 F. Supp. at 50). Although the precise dimensions of the TCA's general statutory prohibitions have not been defined, the TCA undoubtedly prohibits certain acts such as the adoption of successive moratoria to effectively deny applications, see Sprint Spectrum L.P. v. Jefferson County, 968 F. Supp. 1457, 1468 (N.D. Ala. 1997), and the denial of applications based only on generalized concerns, see, e.g., Easton, 982 F. Supp. at 52; BellSouth Mobility Inc. v. Gwinnett County, 944 F. Supp. 923, 928 (N.D. Ga. 1996).

Despite the statute's relatively recent enactment, a number of district courts have considered its application. See, e.g., AT&T Wireless PCS, Inc. v. Winston-Salem Zoning Bd. of Adjustment, No. 1:97CVO1246, 1998 WL 337748 (M.D.N.C. June 12, 1998), stay denied by 1998 WL 409382 (M.D.N.C. July 17, 1998); Omnipoint Communications, Inc. v. Zoning Hr'g Bd. of East Pennsboro Township, 4 F. Supp. 2d 366 (M.D. Pa. 1998); Gearson & Co. v. Fulton County, No. CIV.A.1:97CV3231WBH, 1998 WL 292095 (N.D. Ga. Apr. 23, 1998); Cellco Partnership v. Town Plan and Zoning Comm'n of Farmington, 3 F. Supp. 2d 178, 1998 WL 220030 (D. Conn. Apr. 13, 1998); Sprint Spectrum L.P. v. Willoth, 996 F. Supp. 253 (W.D.N.Y. 1998); Smart SMR of N.Y., Inc. v. Zoning

21

Comm'n of Stratford, 995 F. Supp. 52 (D. Conn. 1998); Virginia

Metronet, Inc. v. Board of Supervisors of James City County, 984

F. Supp. 966 (E.D. Va. 1998); AT&T Wireless Servs. of Fla., Inc.

v. Orange County, 994 F. Supp. 1422 (M.D. Fla. 1997) ("Orange

County II"); AT&T Wireless Servs. of Fla. v. Orange County, 982

F. Supp. 856 (M.D. Fla. 1997) ("Orange County I"); Century

Cellunet of S. Mich., Inc. v. City of Ferrysburg, 993 F.

Supp. 1072 (W.D. Mich. 1997); Sprint Spectrum L.P. v. Zoning Hr'g

Bd. of East Nottingham Township, No. CIV.A.97-1837, 1997 WL

688816 (E.D. Pa. Oct. 15, 1997); Easton, 982 F. Supp. 47; Sprint

Spectrum L.P. v. Town of Farmington, No. 3:97 CV 863 (GLG), 1997

WL 631104 (D. Conn. Oct. 6, 1997); AT&T Wireless PCS, Inc. v.

City Council of Virginia Beach, 979 F. Supp. 416 (E.D. Va. 1997);

OPM-USA-INC. v. Board of County Comm'rs of Brevard County, No.

97-408-CIV-ORL-19, 1997 WL 907911 (M.D. Fla. Aug 26, 1997);

Jefferson County, 968 F. Supp. 1457; Illinois RSA No. 3 v. County

of Peoria, 963 F. Supp. 732 (C.D. Ill. 1997); Western PCS II

Corp. v. Extraterritorial Zoning Auth., 957 F. Supp. 1230 (D.N.M.

1997); BellSouth Mobility, 944 F. Supp. 923; Sprint Spectrum,

L.P. v. City of Medina, 924 F. Supp. 1036 (W.D. Wash. 1996). To

date, neither the Circuit Courts nor the District Court for the

District of New Hampshire has ruled upon the TCA. Against this

background, the court considers the specific arguments presented

22

by the parties in the defendant's Rule 12 motion and the parties' cross-motions for summary judgment.

I.  Defendant's Rule 12 Motion

On April 17, 1998, the defendant filed a motion for judgment on the pleadings seeking to dismiss the plaintiff's claims.[11] Pursuant to Fed. R. Civ. P. 12(c), such a motion will be granted if, accepting all of the plaintiff's factual averments contained in the complaint as true and drawing every reasonable inference helpful to the plaintiff's cause, "it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief."  Rivera-Gomez v. de Castro, 843 F.2d 631, 635 (1st Cir. 1988).  The court's inquiry is a limited one, focusing not on "whether a plaintiff will ultimately prevail but whether [it] is entitled to offer evidence to support the claims."  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) (motion to dismiss under Fed. R. Civ. P. 12(b)(6)).  Great specificity is not required to survive a Rule 12 motion.  "[I]t is enough for a

---

[11]The defendant styled its motion as a "Motion to Dismiss" but did not specify the provision of the Federal Rules of Civil Procedure under which it seeks to have the plaintiff's case dismissed.  Because the defendant answered the plaintiff's second amended complaint on April 10, 1998, the pleadings closed under Fed. R. Civ. P. 7(a) as of that date.  The court therefore treats the defendant's motion as a motion for judgment on the pleadings. See Fed. R. Civ. P. 12(c).

plaintiff to sketch an actionable claim by means of 'a generalized statement of facts.'" <u>Garita Hotel Ltd. Partnership v. Ponce Fed. Bank</u>, 958 F.2d 15, 17 (1st Cir. 1992) (quoting 5A Charles A. Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 1357 (1990)).

In support of its motion, the defendant argues that the court lacks jurisdiction under the TCA to hear claims against the Selectmen.  It contends that the TCA limits the exercise of the court's jurisdiction to the review of zoning decisions and the only body that exercised zoning authority in this case was the ZBA.  The defendant also requests that the court dismiss all claims arising under 47 U.S.C. § 332(c)(7)(B)(ii) because the Town acted on the plaintiff's applications in a reasonable period of time.  The plaintiff responds that there is only one defendant in this case, the Town of Amherst, and urges the court to reject the defendant's attempt to limit the court's review to the actions of the ZBA.  The plaintiff also contends that its TCA claim should not be dismissed, <u>inter alia</u>, because the time within which the defendant acted is an integral part of its claim that the defendant's actions, taken together, violated the TCA.

As the plaintiff has noted, the Town of Amherst is the only defendant named in this action.  The court finds no authority for the defendant's effort to separate the actions of the Selectmen

24

from the actions of the ZBA where the Town is the named defendant and the acts of both the Selectmen and the ZBA are alleged to be part of the TCA violation.[12]  To adopt such an approach would impermissibly allow local officials acting in concert to impose conflicting requirements upon a telecommunications provider that, while not violating the TCA individually, could have the combined effect of prohibiting the provision of PWS services.  The court holds that the Town is a proper defendant in this action.

Although it is true that the actions of the ZBA, which denied the formal applications for the proposed towers and upheld the HDC's rejection of the public safety complex site, will be of primary importance to the court's inquiry, the actions of other Town authorities are relevant to the issue of whether the Town violated the TCA.  As such, the court may properly review all of the plaintiff's dealings with Town officials pertinent to the denial of its applications for PCS facilities, whether they be by the Selectmen, the HDC, or the ZBA.  Therefore, the court will neither "dismiss" the Selectmen, who were never defendants in the

_____

[12]The plaintiff has also asserted that the actions of the HDC constitute part of the alleged TCA violation.  The court notes that the defendant's motion to dismiss makes no attempt to characterize or accommodate the HDC's denial of the public safety complex application within its attempted distinction between the actions of the Selectmen and the ZBA, further highlighting the problematic nature of such a distinction in this case.

case, nor limit its review solely to the actions of the ZBA.

The defendant's attempt to separate an alleged TCA violation based on 47 U.S.C. § 332(c)(7)(B)(ii) from the rest of the plaintiff's complaint is also unjustified. The plaintiff's second amended complaint contains only one count, which details several ways in which the defendant is alleged to have violated the TCA. Even assuming arguendo that time taken by the ZBA to reach its decision does not itself constitute a violation of 47 U.S.C. § 332(c)(7)(B)(ii), the timing and circumstances surrounding the ZBA decision are still relevant to the plaintiff's claim that the defendant violated the TCA by having the effect of prohibiting PCS services. Thus, the defendant has not shown its entitlement to judgment on the pleadings on the plaintiff's claim of unreasonable delay.

For these reasons, the defendant's Rule 12 motion (document no. 17) is denied.

II. Cross-Motions for Summary Judgment

In addition to the defendant's Rule 12 motion, both parties have moved for summary judgment. The role of summary judgment is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." Snow v. Harnischfeger Corp., 12 F.3d 1154, 1157 (1st

26

Cir. 1993) (quoting <u>Wynne v. Tufts Univ. Sch. of Med.</u>, 976 F.2d 791, 794 (1st Cir. 1992)). The court may only grant a motion for summary judgment where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is thus appropriate where the material facts are not in dispute and the motions present solely an issue of law. <u>See</u> <u>Reich v. John Alden Life Ins. Co.</u>, 126 F.3d 1, 6 (1st Cir. 1997). Here, although the parties differ as to the characterization and significance of certain facts, the material facts are undisputed and resolution of the case on summary judgment is appropriate.[13]

The cross-motions present the following five issues: (1) the scope of the court's jurisdiction and proper extent of the court's review; (2) whether the defendant acted on the plaintiff's applications in a reasonable time; (3) whether the defendant's denial of the plaintiff's applications constituted a

_____

[13]Furthermore, because the court is required to apply the "traditional means of reviewing agency actions," which consists of relying on a written decision to analyze the defendant's rationale and determine whether it is supported by substantial evidence, a serious question exists as to whether TCA cases of this kind are ever appropriate for resolution by a trial. <u>See, e.g.</u>, <u>Smart SMR</u>, 995 F. Supp. at 56.

written decision supported by substantial evidence contained in a written record; (4) whether the defendant's denial of the plaintiff's applications prohibited or had the effect of prohibiting the provision of PCS services in Amherst; and (5) if the defendant's acts violated the TCA, what the appropriate remedy would be.  The court considers these issues seriatim.

1.    The Court's Jurisdiction and Proper Scope of
      Review Under the TCA

The defendant has reiterated its argument that the court lacks jurisdiction to consider the acts of the Amherst Selectmen in the summary judgment context.  However, the argument fails on summary judgment for the same reasons.  See Section I, supra. Even assuming arguendo that the acts of the Selectmen were not themselves zoning decisions, they were part of the course of conduct engaged in by various Town entities that culminated in the denial of the plaintiff's applications, which the defendant concedes is a zoning decision that may properly be reviewed under the TCA.  Nothing in the plain language of the TCA or the cases cited by the defendant suggests that the court is precluded from considering the entire course of conduct leading up to the denial of the applications.  Towns act through their various officials, boards, and commissions.  The court may properly consider all of

28

the acts of the defendant in determining whether the denial of the plaintiff's applications violated the TCA.

### 2. Action Within Reasonable Time

The TCA provides, in part, the following:

> A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request.

47 U.S.C.A. § 332(7)(B)(ii) (West Supp. 1998). This provision prevents both unreasonable delay in deciding the merits of individual applications and unreasonable delay in processing applications in general through such techniques as the institution of moratoria. See Farmington, 1997 WL 631104, at *6 (moratorium); Jefferson County, 968 F. Supp. at 1468 (series of moratoria). The prohibition against delay is not absolute and no specific time period within which to pass on applications is prescribed; the limit is one of reasonableness under the circumstances. Compare, e.g., id. (series of moratoria invalid) with Medina, 924 F. Supp. at 1037, 1040 (six-month moratorium on granting permits adopted five days after enactment of TCA to allow defendant to gather information and process applications does not violate TCA).

29

In this case, the plaintiff began negotiations with the Selectmen in approximately April, 1997. The negotiations were concluded on August 27, 1997, when leases were entered into on the proposed tower locations. On September 4, 1997, the plaintiff submitted applications to the ZBA that were subsequently expanded and revised. The ZBA denied the applications on December 16, 1997. The plaintiff requested a rehearing on January 2, 1998. The ZBA allowed the plaintiff's request for a rehearing on January 12, 1998. It held the rehearing on February 17, 1998, deliberated on March 5, 1998, and issued its final denial on March 16, 1998.

The defendant urges that it acted on the plaintiff's applications within a reasonable period of time. In support of this claim, it points to the fact that approximately three and one-half months elapsed from the time the plaintiff filed its applications with the ZBA until those applications were denied. The plaintiff responds that the additional time which the plaintiff spent engaged in negotiation with the Selectmen should be considered as part of the total time to reach a decision. In addition, the plaintiff urges that three and one-half months is unreasonable because it exceeds the amount of time normally required for ZBA action. It asserts that the ZBA erred by allowing extensive public comment and, at a late stage in the

30

proceedings, opening the process for a consideration of regional impact.

The plaintiff's argument that time spent negotiating with the Selectmen should be considered as part of the total when determining whether the defendant took an unreasonable time to act on the plaintiff's applications overlooks the fact that it would have been required to spend time negotiating with any private landowners who it might have approached to seek the siting of PCS facilities in Amherst. Evidence in the record suggests that the plaintiff usually spends six months engaged in such an initial negotiation and system design process; here it concluded negotiations with the Selectmen in approximately five months. Although at some point a municipality might make preliminary negotiations so protracted that they constitute a clear effort to delay or derail the application process, nothing in the facts of this case suggests that this was the intent or effect of the timing of negotiations between the plaintiff and the Selectmen.

In support of its claim, the plaintiff introduced evidence suggesting that the ZBA normally attempts to resolve applications within ninety days of their submission. The plaintiff's argument that the three and one-half months the defendant took to deny its applications itself constitutes an unreasonable amount of time

31

because it exceeded the normal ninety-day period, however, is inapposite. The reasonable time requirement does not present an absolute deadline in which to pass on PWS applications, for what constitutes a reasonable time in a given case is measured "taking into account the nature and scope of such request." 47 U.S.C.A. § 332(7)(B)(ii). The ZBA chairman noted that the ZBA had received more information relating to the plaintiff's applications than any previous applications. In addition, the volume of public response to the applications was extremely high. The court must consider both of these factors in determining whether the ZBA unreasonably delayed making its decision.

Certain actions and decisions of the ZBA undoubtedly extended the decision-making process, but the record does not indicate that these actions were improper in intent or effect.[14] If the ZBA had decided sooner to hear input on the possible regional impact of the applications or had further curtailed the opportunity for public comment on the applications, a decision could have been reached more quickly. At some point, acts such as raising additional procedural hurdles well after the process has begun and providing expansive opportunity for repetitious

_____

[14]Indeed, some delay in the final resolution of the applications appears to have been occasioned by the plaintiff itself, such as its supplementation of its apparently incomplete initial applications and its request for a rehearing.

32

public comment can create an unreasonable delay.  However, there is no indication that such a point was reached in this case.  Given the complexity of the applications, neither the time added to the process by the challenged ZBA actions nor the total time required by the ZBA to make its decision violated the requirement of 47 U.S.C. § 332(7)(B)(ii).

The conclusion that the ZBA acted on the plaintiff's applications in a reasonable time given the nature and the scope of the requests, however, does not end the relevance of the duration of the decision-making process to the question of whether the defendant violated the TCA.  As discussed more fully in subsection 4 <u>infra</u>, the chronology of the plaintiff's dealings with the defendant is relevant to the question of whether the defendant prohibited or had the effect of prohibiting the provision of PCS services.

3.  <u>Written Decision Supported by Substantial Evidence<br>Contained in Written Record</u>

The TCA also provides the following:

> Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

47 U.S.C.A. § 332(7)(B)(iii) (West Supp. 1998).  The substantial

33

evidence standard "'requires governing bodies to produce a written decision, detailing the reasons for the decision and the evidence that led to the decision.'" <u>Cellco Partnership</u>, 1998 WL 220030, at *5 (finding that denial was not supported by substantial evidence in written record) (quoting <u>Virginia Metronet</u>, 984 F. Supp. at 972). Although a telecommunications provider must come forward with a certain minimal amount of information in support of its applications in order to prevail, once an application has been supported this provision places the burden of proof to support any denial on the local government entity issuing the denial. <u>Compare</u> <u>Smart SMR</u>, 995 F. Supp. at 56, <u>and</u> <u>Easton</u>, 982 F. Supp. at 52 ("[B]ecause the TCA effectively preempts state law in several respects, including the burden of proof, . . . it is the [defendant's] burden to produce substantial evidence supporting its denial of plaintiff's application.") (internal quotation omitted), <u>with</u> <u>Gearson</u>, 1998 WL 292095, at *3 (court dismissed plaintiff's claim that defendants' denial of its application to erect a tower violated TCA based on plaintiff's complete failure to submit necessary supporting information).

Although the nature of the inquiry into whether a denial is supported by substantial evidence is highly fact-specific, certain general principles have been established. To withstand

judicial scrutiny a denial must be specific and detailed, for courts have found denials based on generalized aesthetic and safety concerns to be insufficient to meet the substantial evidence standard. See Easton, 982 F. Supp. at 52; BellSouth Mobility, 944 F. Supp. at 928. As one court has stated:

> [L]ocal governments may not mask hostility to wireless communications facilities with unreasoned denials that make only vague references to applicable legal standards. The procedural requirement of a written decision with articulated reasons based on record evidence forces local governments to rely on supportable neutral principles if they wish to deny a particular wireless installation.

Orange County I, 982 F. Supp. at 862. In addition, where a party has done everything possible to support an application and "it appears from the record that there is nothing [the applicant] could have done which would have met with the approval of the [local authority,]" a denial under those circumstances is not based on substantial evidence in a written record. OPM-USA, 1997 WL 907911, at *11.

In this case, the plaintiff contends that the defendant violated the TCA because the ZBA's decision to deny its applications was not supported by substantial evidence contained in a written record. The defendant urges that its decisions were supported by substantial evidence. The rationale for the initial ZBA denial was limited to the text of the motions proposed by ZBA

Member Rowe.  After rehearing and while this case was pending, the ZBA supplemented its denial with additional written findings. Because the plaintiff itself requested rehearing, the court concludes that the entire written record created through the final denial issued on March 16, 1998, may be properly considered as part of the denial.  But cf. Winston-Salem, 1998 WL 337748, at *3 (rejecting written decision produced after appeal had been taken of one-word, rubber-stamped denial as pretextual).  The court holds that the ZBA denial satisfies the requirements of a written decision based on a written record.

The court is therefore presented with the question of whether the ZBA denial was based on substantial evidence.  The issue is complicated by the fact that the ZBA clearly relied on a number of impermissible factors in denying the applications.  For example, the denials rely in part on the ZBA's determination that the plaintiff failed to adequately support the applications and to demonstrate entitlement to a variance by showing that the proposed tower sites could not be used for anything other than a telecommunications tower.  Not only does such reasoning represent an impermissible attempt to shift the burden of proof back onto the applicant, see Easton, 982 F. Supp. at 52 (noting that local laws placing burden of proof on PWS provider to support application are preempted by TCA), it also presents an

36

insurmountable burden for any applicant. The court takes notice of the fact that no applicant will ever be able to demonstrate that the only viable use for a given property is to site a PWS tower. In light of the ZBA Chairman's recognition that the plaintiff had submitted more information in support of its applications than had been previously submitted for any other project, the ZBA's determination that the applications were inadequately supported appears to be a pretext masking hostility toward PWS towers. See OPM-USA, 1997 WL 907911, at *11 (where a party has done everything possible to support an application and "it appears from the record that there is nothing [the applicant] could have done which would have met with the approval of the [local authority,]" a denial under those circumstances is not based on substantial evidence in a written record); see also Orange County I, 982 F. Supp. at 862.[15]

Despite the ZBA's consideration of and reliance on impermissible factors in denying the applications, its denial also relies on reasons that it could permissibly consider, such as the effect of the proposed towers on neighboring property

---

[15]Additional examples of the ZBA's reliance on improper considerations include its finding that the plaintiff was more concerned about providing PCS service to the commuters on Route 101 than the residents of Amherst and its determination that the plaintiff had failed to research adequately other technologies.

values.  The court need not determine, however, whether any of the reasons advanced by the defendant for the denial of the plaintiff's applications constitute substantial evidence sufficient to justify the denial.  Whether or not the denial was supported by substantial evidence, it has the effect of prohibiting the provision of PCS services, as discussed in subsection 4 _infra_.

### 4. Effective Prohibition of PWS Services

The TCA provides, in part, the following:

> (i)  The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof—
>
> . . .
>
> (II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

47 U.S.C.A. § 332(7)(B)(i)(II) (West Supp. 1998).  The TCA does not define the term "have the effect of prohibiting," but some courts have considered the meaning of the provision.  A local government may, in some cases, deny an application without having the effect of prohibiting the provision of PWS services, _see_ Virginia Beach, 979 F. Supp. at 426-27, but the circumstances surrounding a single denial may provide sufficient evidence from

which to conclude that the local government has a policy with the effect of prohibiting the provision of PWS services, see Smart SMR, 995 F. Supp. at 58. In addition, a town can, through delay, violate this provision without ever having denied a single application. See Farmington, 1997 WL 631104, at *6; Jefferson County, 968 F. Supp. at 1468. Denials that "mask hostility to wireless communications facilities," Orange County I, 982 F. Supp. at 862, and denials where "it appears from the record that there is nothing [the applicant] could have done which would have met with the approval of the [local authority,]" OPM-USA, 1997 WL 907911, at *11, violate the TCA because they amount to a policy the effect of which is to prohibit the provision of PWS services.

On the other hand, denial of a single application or set of applications may be proper where PWS service is already established and the applications seek only to enhance the existing service. See, e.g., Century Cellunet, 993 F. Supp. at 1077.[16] Denial may also be proper where the record itself or the governmental authority making the denial makes clear how the failure of the system to meet approval can be remedied in future

---

[16]Such denials may, on the other hand, unreasonably discriminate between providers of functionally equivalent services in violation of 47 U.S.C. § 332(7)(B)(i)(I). In this case, the plaintiff has not claimed that the defendant has violated this provision of the TCA.

applications.  See, e.g., Willoth, 996 F. Supp. at 258 (denial of applications for system of three towers upheld where defendant demonstrated by substantial evidence that one centrally located tower could provide same level of service).  In both cases, the rationale for the denial demonstrates that the local government entity is not opposed to towers in general, but instead holds legitimate objections to the specific proposal before it.

Here, the defendant's zoning ordinance does not allow the placement of PWS towers anywhere in the Town as of right even though it does not expressly prohibit all PWS facilities.  It is evident, however, that the zoning ordinance, as written and applied, creates serious obstacles to gaining approval for such facilities.  The plaintiff alleges that the defendant's denial of its applications and the rationale underlying the denial violate the TCA because they have the effect of prohibiting the provision of PCS services in Amherst.  The defendant asserts that its actions have not had such an effect and were limited to a proper rejection of the applications before it.  It has invited the plaintiff to seek approval for new applications if it so desires.  The invitation comes too late and without any indication that the plaintiff would fare any better.

In addition to the impermissible reasons relied on by the ZBA for its denial already discussed in subsection 3, supra, the

ZBA rejected the plaintiff's applications by relying on a standard that could be used to deny any subsequent applications that the plaintiff might bring. Among other things, the ZBA relied on general aesthetic concerns by finding that the proposed towers would "interfere with the view from any public land, natural scenic vista, historic building or district or major view corridor," and that "[t]hese behemoths would be a blight upon a pastoral and rural area which has been and hopefully will continue to be a source of comfort and relaxation for its inhabitants who have chosen to live in and maintain this scenic and bucolic atmosphere." Decision at 5; id., Attach. A, at 4. The denial provides neither an indication as to how the plaintiff could overcome such amorphous concerns on future applications nor any guidance as to where it might permissibly locate towers to construct a functioning PCS system.

The court notes that aesthetic concerns about the appearance of towers will always be an issue, for "it would be a rare event to be able to buffer a communications tower so that it is not visible at all." OPM-USA, 1997 WL 907911, at *8. Although aesthetic considerations may be properly taken into account by local governments in some circumstances, they cannot be used to exclude PWS towers entirely. The practical and legal effect of what Congress has done by enacting the TCA is to ensure that

telecommunications towers will become part of the American landscape. The nature and character of the ZBA's denial here provides no guidance as to how the plaintiff might reasonable satisfy the ZBA's concerns, no indication that the next set of applications would fare any better, and ample reason to believe that it probably would not. The court finds that the ZBA has evinced a hostility toward the erection of PWS towers in Amherst, that such hostility amounts to a policy that has the effect of prohibiting PWS service in Amherst, and that the defendant's denial of the plaintiff's applications therefore violates the TCA.[17]

5.    Remedy

Given the court's conclusion that the defendant violated the TCA in its denial of the plaintiff's applications, the court must consider the issue of an appropriate remedy to correct the violation. For whatever reason, Congress when it enacted the TCA did not specify what the remedy for a violation of its provisions would be. See BellSouth Mobility, 944 F. Supp. at 929. The two basic choices of remedy employed by courts after finding a TCA

_____

[17]Because the court has concluded that the defendant's denial violated 47 U.S.C. § 332(7)(B)(i)(II) for the reasons stated, it need not consider the plaintiff's argument that the defendant violated the TCA in several additional respects.

42

violation are:  (1) remand to the local authority for additional consideration or reconsideration; or (2) mandatory injunctive relief, usually in the form of an order granting the improperly denied applications.  See, e.g., Virginia Beach, 979 F. Supp. at 430; BellSouth Mobility, 944 F. Supp. at 929.[18]

In choosing between a remand and injunctive relief, several courts have determined that

> simply remanding the matter to [the relevant local authority] for their determination would frustrate the TCA's intent to provide aggrieved parties full relief on an expedited basis.

Id.; accord Easton, 982 F. Supp. at 52; Western PCS, 957 F. Supp. at 1237.  In addition to the statutory requirement that local governments act on applications within a reasonable time, see 47 U.S.C.A. § 332(7)(B)(ii), the TCA also directs the court to resolve TCA claims on an expedited basis, see 47 U.S.C.A. § 332(c)(7)(B)(v).  Remand is particularly inappropriate where the case would go back before a local government that has already

_____

[18]Despite the fact that several courts have purported to issue writs of mandamus, the court notes that the writ of mandamus has been abolished in United States district court.  See Fed. R. Civ. P. 81(b); see also Virginia Beach, 979 F. Supp. at 430 & n.25 (granting mandatory injunction); cf., e.g., Western PCS, 957 F. Supp. at 1239 (granting mandamus); Jefferson County, 968 F. Supp. at 1469 (same); BellSouth Mobility, 944 F. Supp. at 929 (same).  The effect of mandatory injunctive relief, however, is the same as the effect of a writ of mandamus.  See Virginia Beach, 979 F. Supp. at 430-31.

demonstrated hostility toward the location of PWS facilities within its borders. See Virginia Beach, 979 F. Supp. at 431.

Here, the defendant has urged that mandatory injunctive relief would be inappropriate because the plaintiff's site review application has not been denied and because the plaintiff has not applied for any other permit from the town. It suggests that, to the extent that it has violated the TCA, a remand would be appropriate. The plaintiff argues that, given the ZBA's hostility to its applications, mandatory injunctive relief is appropriate.

The court concludes that remanding the case to the defendant would be inconsistent with the purposes of the TCA. The ZBA has already denied the plaintiff's applications after extensive consideration. The denial was based, at least in part, on impermissible considerations that evince a hostility toward the construction of PCS towers in Amherst. The Town has had its opportunity to address the plaintiff's applications and has failed to comply with the TCA. A remand would allow further delay and in all probability would result in another denial of the plaintiff's applications. The TCA requires an expeditious determination of these matters and allows municipalities an initial opportunity to work with telecommunications providers at finding a mutually acceptable location for PWS facilities, but

44

discourages giving municipalities that violate its terms a second chance.  See Virginia Beach, 979 F. Supp. at 430-31.  Therefore, the court holds that mandatory injunctive relief ordering the defendant to approve the applications and remove any barriers to the construction of the proposed towers is the appropriate remedy.

The court notes that the license agreements entered by the plaintiff and the defendant, through the Selectmen, for the proposed tower sites on Town-owned land have, by their terms, terminated.  The agreements provided for an initial 120 day period from their execution within which the plaintiff had to procure necessary approvals or permits.  It also allowed the plaintiff to extend this period for an additional 120 days but provided that the failure of the plaintiff to obtain approval within the extended period would terminate the agreement.  The plaintiff never obtained the ZBA's approval.  The 240-day period did not expire, however, until this case was pending and the ZBA, an instrumentality of the defendant, had already denied the plaintiff's applications initially and on rehearing.  The court has determined that the ZBA's denial was unlawful and was not the fault of the plaintiff.  Because the ZBA's denial was null and void, the relief herein granted relates back to December 16, 1997, the date of the initial unlawful denial.  As of that date

45

the licensing agreements were in effect and therefore shall remain effective as if the ZBA had approved the plaintiff's applications on that date.

## Conclusion

The plaintiff is entitled to summary judgment because the defendant's denial of its applications had the effect of prohibiting the provision of PWS services in the Town of Amherst contrary to 47 U.S.C. § 332(7)(B)(i)(II). A fortiori, the defendant is not entitled to summary judgment. The defendant's Rule 12 motion (document no. 17) and summary judgment motion (document no. 20) are denied and the plaintiff's summary judgment motion (document no. 6) is granted.

## O R D E R

The decisions of the defendant denying the plaintiff's applications for variances on the Bragdon Farm site, the municipal recycling center site, the public safety complex site, and the Christ's Church site are null and void. The court orders the defendant, its officers, boards, commissions, departments, and instrumentalities to approve the plaintiff's applications and remove any further impediments to the plaintiff's construction of the proposed towers, including the issuance of any required

46

permits, within forty-five days of the date of this order.  The
clerk is ordered to close the case.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
District Judge

August 21, 1998

cc:  Steven E. Grill, Esquire
     Robert D. Ciandella, Esquire